UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ELIZABETH R. CARTER, as | ) | |
| Personal Representative of the Estate | ) | |
| of Frances E. P. Roper, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No. 5:18-cv-01380-HNJ |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

This action proceeds before the court on Defendant's Amended Motion to Dismiss or Alternatively for Summary Judgment. (Doc. 17). At the outset, the court does not possess subject matter jurisdiction over this action due to Plaintiff Elizabeth R. Carter's failure to file a timely administrative claim seeking a refund of tax payments. However, the court heeds recent Supreme Court jurisprudence establishing that most limitations periods are claims-processing rules rather than jurisdictional requisites, yet the same result ensues because Carter's alleged financial disability does not equitably toll the limitations period, whether deemed jurisdictional or not. Furthermore, the Internal Revenue Service properly assessed the stock at issue pursuant to its fair market exchange value rather than a reduced value engendered by a massive criminal fraud. Therefore, on the merits Carter's claim for a tax refund falters.

As a result, for the reasons set out herein, the court **GRANTS** Defendant's motion.

## STANDARD OF REVIEW

*Rule 12(b)(1) Motion*

"Federal courts are courts of limited jurisdiction" and, as such, possess the power to hear cases only as authorized by the Constitution or United States' laws. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

Federal Rule of Civil Procedure 12(b)(1) permits a district court to dismiss a case for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Plaintiff bears the burden of persuasion on establishing the court's subject matter jurisdiction. *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) (citing *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942)).

The Eleventh Circuit establishes particular modes of review for Rule 12(b)(1) challenges to subject matter jurisdiction:

> [A] motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) can be based upon either a facial or factual challenge to the complaint. If the challenge is facial, the plaintiff is left

with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised . . . Accordingly, the court must consider the allegations in the plaintiff's complaint as true . . . A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion . . .

Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered. Furthermore, . . . the district court has the power to dismiss for lack of subject matter jurisdiction on any of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.

*McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (citing, *inter alia*, *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981); *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)) (internal quotation marks and alterations omitted).

Therefore, a factual challenge to subject matter jurisdiction typically permits a "trial court . . . to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson*, 645 F.2d at 412-13. No presumptive truthfulness would attach to a plaintiff's claims, and "the existence of disputed material facts [would] not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id*; *see also Lawrence*, 919 F.2d at 1528-29.

When "a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before

addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977));[1] *Harris v. Board of Trustees Univ. of Ala.*, 846 F. Supp. 2d 1223, 1230 (N.D. Ala. 2012) (court considered Rule 12(b)(1) jurisdictional challenge before addressing Rule 12(b)(6) arguments).

*Rule 12(b)(6) Motion*

Rule 12(b)(6), Federal Rules of Civil Procedure, permits a court to dismiss a complaint if it fails to state a claim for which relief may be granted. In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court revisited the applicable standard governing Rule 12(b)(6) motions to dismiss. First, courts must take note of the elements a plaintiff must plead to state the applicable claims at issue. *Id.* at 675.

After establishing the elements of the claim at issue, the court identifies all well-pleaded, non-conclusory factual allegations in the complaint and assumes their veracity. *Id.* at 679. Well-pleaded factual allegations do not encompass mere "labels and conclusions," legal conclusions, conclusory statements, or formulaic recitations and threadbare recitals of the elements of a cause of action. *Id.* at 678 (citations omitted). In evaluating the sufficiency of a plaintiff's pleadings, the court

---

[1] All decisions of the former Fifth Circuit handed down prior to September 30, 1981, constitute binding precedent on this Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

may draw reasonable inferences in plaintiff's favor. *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005).

Third, a court assesses the complaint's well-pleaded allegations to determine if they state a plausible cause of action based upon the identified claim's elements. *Iqbal*, 556 U.S. at 678. Plausibility ensues "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and the analysis involves a context-specific task requiring a court "to draw on its judicial experience and common sense." *Id.* at 678, 679 (citations omitted). The plausibility standard does not equate to a "probability requirement," yet it requires more than a "mere possibility of misconduct" or factual statements that are "merely consistent with a defendant's liability." *Id.* at 678, 679 (citations omitted).

As the Eleventh Circuit provides, "[o]rdinarily, we do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss." *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368 (11th Cir. 1997)). The Eleventh Circuit "recognizes an exception, however, in cases in which a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss." *FSA*, 500 F.3d at 1284 (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th

5

Cir. 1999); *Brooks*, 116 F.3d at 1368–69). The exception applies in this case, as Defendant submits the Certificate of Assessments and Payments regarding the federal estate tax liability of the Estate of Frances E.P. Roper, the Estate's September 17, 2013, refund claim, and the IRS's acknowledgement of receipt of the refund claim on September 25, 2013. These documents are central to the Estate's refund claim.

## FACTS

Plaintiff Elizabeth R. Carter serves as the personal representative of the Estate of Frances E. P. Roper. Ms. Roper died on September 21, 2007. At the time of her death, Ms. Roper owned 567,092 shares of Colonial BancGroup stock, worth a market value of $17,604,767. Ms. Roper bequeathed the majority of her estate, comprised primarily of Colonial BancGroup stock, to her niece, Elizabeth R. Carter, and her nephew, Randy Roper. Within six months after Ms. Roper's death, the market value of the stock had decreased to $8,548,947.

On June 19, 2008, Plaintiff filed a federal estate tax return, reporting an estate valued at $6,261,530.00 and tendering payment of the computed tax. On April 26, 2009, the Estate filed an amended return reporting a slightly lower tax of $6,169,892. The Colonial stock represented 46.8% of the gross estate. In valuing the Colonial stock, the Estate used the alternative valuation date to calculate the fair market value, a

method which relies upon the stock's exchange price six months after a decedent's death. The IRS accepted the amended return and issued a refund.[2]

On September 13, 2013, the Estate filed a refund claim with the Internal Revenue Service, alleging it overpaid its estate tax by $3,731,616, due to a criminal fraud perpetrated against Colonial by one of its customers.[3] The Estate asserted it did not have to rely upon the stock's exchange price for valuation due to the criminal fraud involving the bank. The IRS denied the claim.

---

[2] Ms. Carter and Mr. Roper allege Colonial Bank and its executives urged them not to sell their shares as their value began to decrease. Instead, they obtained a loan from Colonial Bank to pay the estate tax, for which Colonial Bank required personal guarantees from Ms. Carter and Mr. Roper. They remain liable on these personal guarantees.

[3] The United States prosecuted and obtained convictions against Lee Bentley Farkas for bank, wire and securities fraud, and conspiracy to commit the same, arising from a multibillion dollar scheme to hide the financial difficulties of Taylor, Bean, & Whitaker Mortgage Corp. ("TBW") during his tenure as chairman and principal owner of TBW. TBW received short-term, secured funding from Colonial Bank via a master advance account, and it also maintained an investor funding account at Colonial which housed proceeds from loan sales to investors in the secondary market. Between 2002 and 2003, Farkas and his co-conspirators disguised overdrafts of TBW's master advance account by "sweeping" funds from TBW's investor funding account into and out of the master advance account. As a result of this sweeping scheme, Colonial Bank's daily reports did not depict the overdrafts. As the deficit in TBW's account grew to well over $100 million, Farkas and his co-conspirators initiated more sophisticated schemes, including "Plan B."

Under Plan B, TBW sold sham mortgage loans and loan pools to Colonial Bank. Colonial Bank held approximately $250 million in Plan B individual loans on its books by mid–2005, and approximately $500 million by August 2009. As a result, Colonial BancGroup significantly overstated the value of its assets in its quarterly and annual reports to the United States Securities and Exchange Commission. *See United States v. Farkas*, 474 F. App'x 349, 350–51 (4th Cir. 2012).

A grand jury returned an indictment against Farkas on June 15, 2010. *See United States v. Farkas*, No. 1:10CR200 LMB, 2010 WL 3835110 (E.D. Va. Sept. 24, 2010). A jury convicted Farkas on April 19, 2011. *See United States v. Farkas*, No. 1:10cr200 (LMB), 2011 WL 5101752 (E.D. Va. Oct. 26, 2011).

On August 14, 2009, the Alabama State Banking Department closed Colonial Bank, and the Federal Deposit Insurance Corporation (FDIC) assumed receivership over the bank. By December 17, 2010, Colonia's stock closed at $0.07 per share and could no longer be publicly traded. (Doc. 17-4 at 4).

The Estate commenced a federal court action seeking a refund of the purportedly overpaid estate tax. *Elizabeth R. Carter, Personal Representative of the Estate of Frances E.P. Roper v. United States*, Case No. 2:15-cv-02357-TMP (N.D. Ala.). The government moved to dismiss the action on the basis of lack of subject matter jurisdiction and lack of merit. The Estate then sought dismissal of the action without prejudice, which the government did not oppose. The court dismissed the action without prejudice on May 12, 2016.

The Estate filed another refund claim on August 26, 2016, on the same ground as previously asserted. The medical opinion of Ms. Carter's treating physician, Dr. William Hahn, accompanied the claim, in which he declared Ms. Carter suffered from a medical impairment for over five years which prevented her from managing the Estate's affairs. Ms. Carter also submitted a declaration in which she attested no other person had authority to act on her behalf in conducting any financial matters.

When the IRS failed to dispose of the claim within the statutorily required time, the Estate filed the instant action for recovery of excess federal tax erroneously or illegally assessed and collected. It contends the Colonial stock was worthless on the valuation date, based on non-public information which later became available. Defendant asserts the court lacks subject matter jurisdiction to adjudicate Plaintiff's claim, yet if subject matter exists, Plaintiff's claim lacks merit.

## I.     The Court Does Not Possess Subject Matter Jurisdiction

As a threshold matter, the Defendant contends the court must dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction because the Estate submitted an untimely refund claim, citing 26 U.S.C. § 6511(a).   Although recent Supreme Court jurisprudence strongly suggests any untimeliness does not deprive the court of subject matter jurisdiction, the court agrees with Defendant's contention.

Under settled principles of sovereign immunity, "the United States, as sovereign, 'is immune from suit, save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'"   *United States v. Testan*, 424 U.S. 392, 399 (1976) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).   The United States has waived its sovereign immunity to allow taxpayers to file actions seeking tax refunds:   "The district courts shall have original jurisdiction . . . of [a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected . . . ."   28 U.S.C. § 1346(a)(1).

However, a claimant may not maintain a refund suit in any court "until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof."   26 U.S.C. § 7422(a); *Wachovia Bank, N.A. v. United States*, 455 F.3d 1261, 1264

9

(11th Cir. 2006). The most pertinent law for this case involves the statute of limitations contained in 26 U.S.C. § 6511(a). Section 6511(a) provides in pertinent part:

> Claim for credit of refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later. . . .

26 U.S.C. § 6511(a). Subsection (b)(1) provides that "[n]o credit or refund shall be allowed or made after the expiration of the period of limitation prescribed in subsection (a) for the filing of a claim for credit or refund, unless a claim for credit or refund is filed by the taxpayer within such period." *Id.* § 6511(b)(1). Therefore, "unless a claim for refund of a tax has been filed within the time limits imposed by [section] 6511(a), a suit for refund . . . may not be maintained in any court." *United States v. Dalm*, 494 U.S. 596, 602 (1990) (citing *United States v. Kales*, 314 U.S. 186, 193 (1941)); *United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 5 (2008) ("unless a claim for refund of a tax has been filed within the time limits imposed by § 6511(a), a suit for refund . . . may not be maintained in any court."); *Wachovia Bank*, 455 F.3d at 1269 (a claimant's failure to comply with § 6511(a) deprives a district court of subject-matter jurisdiction over a refund claim).

Application of § 6511(a) proceeds straightforwardly, as Carter clearly violated the provision in the circumstances at bar. When the Estate filed its 2013 and 2016 administrative claims, the limitations period for submitting such a claim had lapsed because the Estate had filed its tax returns in 2008 and 2009. Therefore, the Estate

clearly violated § 6511(a), which bars the court's jurisdiction over a suit regarding such a late-filed claim.

Nevertheless, Carter invokes the financial disability exception to § 6511(a) to toll the filing of the Estate's refund claim.

## II. Carter's Alleged Financial Disability Did Not Toll The Estate's Deadline to File a Refund Claim

Defendant contends Carter's alleged financial disability does not excuse the untimeliness of the Estate's refund claim. The court finds the alleged financial disability of an Estate's personal representative does not extend the filing deadline for the Estate to seek a refund.

To pursue a refund claim, a claimant must file an administrative claim with the IRS before filing suit in federal court. *See* 26 U.S.C. § 7422(a) ("No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . until a claim for refund or credit has been duly filed with the Secretary . . . . "); *Wachovia Bank*, 455 F.3d at 1264 (a refund claimant must adhere to applicable regulations, specifically § 6511(a), before filing suit to obtain a refund). As established previously, a claimant must file the administrative claim within three years from the time the tax return was filed or two years from the time the tax was paid. 26 U.S.C. § 6511(a).

There exists no dispute the Estate failed to file a claim for a refund within § 6511(a)'s prescribed deadlines, as it did not file a claim until 2013, well after 2009 when the Estate filed its amended return. Carter contends the deadline to file the administrative claim should be tolled pursuant to 29 U.S.C. § 6511(h) due to her financial disability.

Title 28 U.S.C. § 6511(h) permits suspension of the filing deadlines while a taxpayer is unable to manage his or her financial affairs due to a disability:

> (1) In general
>     In the case of an individual, the running of the periods specified in subsections (a)[and] (b)[ ] . . . shall be suspended during any period of such individual's life that such individual is financially disabled.
> (2) Financially disabled
>     (A) In general
>     For purposes of paragraph (1), an individual is financially disabled if such individual is unable to manage his financial affairs by reason of a medically determinable physical or mental impairment of the individual which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. An individual shall not be considered to have such an impairment unless proof of the existence thereof is furnished in such form and manner as the Secretary may require.
>     (B) Exception where individual has guardian, etc.
>     An individual shall not be treated as financially disabled during any period that such individual's spouse or any other person is authorized to act on behalf of such individual in financial matters.

26 U.S.C. § 6511(h)(1)–(2); *see also* Saltzman & Book, IRS Practice and Procedure, ¶ 11.03, Rules Applicable to Claims For Credit or Refund, 1999 WL 1050963, at *7

(discussing The IRS Restructuring and Reform Act of 1998's addition of § 6511(h)'s financial disability provision).

Carter asserts that from Fall 2008 to the end of 2013, she suffered from moderate to severe mental and emotional maladies which rendered her incapable of managing the Estate's financial affairs. She provides the declaration of her treating physician, Dr. William Hahn, to support this contention. Both Carter and Dr. Hahn attest the trauma from the Colonial stock's complete devaluation caused Carter's ailments. For these reasons, Carter maintains her disabilities incited § 6511(h)'s equitable tolling provision so as to excuse the untimely filing of the refund claim.

Unfortunately for Carter, estates do not constitute "individuals" subject to § 6511(h)'s provisions. Estates, while able to conduct their affairs only through personal representatives, exist separately from their personal representatives.

First and foremost, the terms and structure of the Internal Revenue Code commands the conclusion that the category "individual" does not include entities such as estates. The Code defines the term "person" as "an individual, a trust, estate, partnership, association, company or corporation." 26 U.S.C. § 7701(a)(1). Therefore, the Code delineates the term "individual" from the term "estate."

To parry the distinction between "individuals" and "estates" for purposes of § 6511(h), Carter cites to examples in the Code treating an estate in the same manner as an individual rather than a corporation. First, Carter cites 26 U.S.C. § 2002, which

requires payment of the estate tax by the executor, and argues estates thus must act through individuals. She also cites 26 U.S.C. § 641(b) ("[t]he taxable income of an estate or trust shall be computed in the same manner as in the case of an individual, except as otherwise provided in this part."). The other statutory provisions cited by Carter impose upon estates the same benefits or burdens as those heaped upon individuals.[4] Plaintiff generally asserts that the Code permits estates to take advantage of tax provisions which by their own terms apply only to individuals.

As an initial rejoinder, many of the provisions cited by Carter implicate computation of tax liabilities; § 6511(h) pertains to the deadline for seeking a refund. Further, the Code contains a separate section addressing federal estate tax, 26 U.S.C. §§ 2001-2210, and provides a separate form (Form 706) to report estate tax. The Code regulates the estate and trust income in 26 U.S.C. §§ 641-685 and requires a report of that income on a separate form (Form 1041). The Code also sets out differing tax rates for estates as opposed to individuals. *See* 26 U.S.C. § 1(a)-(d) (individual income tax rates); 26 U.S.C. § 1(e) (estate income tax rates). Thus, the Code does not treat individuals and estates in the same manner in all respects. While Plaintiff asserts an

---

[4] *See* 26 U.S.C. § 67 (imposing a 2 percent floor on miscellaneous itemized deductions); 26 U.S.C. § 212 (deduction of ordinary and necessary expenses paid or incurred for the collection of income; for management, conservation, or maintenance of property held for the production of income; or in connection with certain tax matters); 26 U.S.C. § 465 (at-risk rules); 26 U.S.C. § 469 (passive activity loss rules); 26 U.S.C. § 163(d) (allowing estates to deduct investment interest expenses only to the extent of the investment income); 26 U.S.C. § 166(d)(1) (requiring estates to characterize nonbusiness bad debts as short-term capital losses); 26 U.S.C. §§ 1014(a), 1223(11) (an estate constitutes a "person" in determining the basis and holding period of property acquired from a decedent).

estate may only act through an individual (or, at times, through a corporate representative, *see Smith v. Wachovia Bank, N.A.*, 33 So. 3d 1191 (Ala. 2009)), the same holds true of corporations. [5]

---

[5] Carter cites *B.W. Jones Tr. v. Comm'r of Internal Revenue*, 132 F.2d 914 (4th Cir. 1943), for the proposition that "American courts have historically held that provisions of the Code using the term 'individual,' but not pertaining directly to the computation of taxable income, are generally construed to apply to trusts and estates." (Doc. 25 at 6). Presumably, Plaintiff relies on the following language from the case:

> Sec. 211(a) of the Revenue Act of 1936, 49 Stat. 1714, as amended by sec. 501 of the Revenue Act of 1937, 26 U.S.C.A.Int.Rev.Acts, page 904, and sec. 211(a) of the Revenue Act of 1938, 52 Stat. 527, 26 U.S.C.A.Int.Rev.Acts, page 1093, contain the following provision: 'There shall be levied, collected, and paid for each taxable year, in lieu of the tax imposed by sections 11 and 12, upon the amount received, by every nonresident alien individual not engaged in trade or business within the United States and not having an office or place of business therein, from sources within the United States * * * a tax of 10 per centum of such amount * * *.'
>
> And sec. 211(b) of these Revenue Acts provides: 'A nonresident alien individual engaged in trade or business in the United States or having an office or place of business therein shall be taxable without regard to the provisions of subsection (a).'
>
> Sec. 161 of the Act, 52 Stat. 517, 26 U.S.C.A.Int.Rev.Acts, page 1080, provides that the taxes imposed 'upon individuals', under the title relating to the income tax, 'shall apply to the income of estates or of any kind of property held in trust'. This means, of course, that the tax is imposed upon the income of the trust and that the trust is taxable under secs. 11 and 12 of the Revenue Act, 26 U.S.C.A.Int.Rev.Acts, page 1002, as contended by the Commissioner, unless it can bring itself within the provisions of sec. 211, i.e. unless it can show (1) that it is nonresident as well as alien, (2) that it is not engaged in trade or business within the United States, and (3) that it does not have an office or place of business in the United States.
> * * * *
> It is the manifest intention of Congress that alien trusts be subjected to the same rule as alien individuals, and such trust is subject to sec. 211 only under circumstances that would subject an individual to it.

*B.W. Jones Tr. v. Comm'r of Internal Revenue*, 132 F.2d at 915–16. No other court has cited *B.W. Jones* for Carter's proposition.

More importantly, extending Code provisions applicable to individuals to matters regarding estates does not convert the "estates" into "individuals."  As reviewed previously, § 6511(h) applies to "individuals" and does not extend its provisions to "estates."   Other courts have adjudicated this issue and reached the same conclusion.[6]

---

[6] *See Murdock v. United States*, 103 Fed. Cl. 389 (2012) (trustee of deceased taxpayer's inter vivos trust cannot claim tolling under § 6511(h); "the physical or mental impairment must be that of the taxpayer, not of some third person"); *Alternative Entm't Enters., Inc. v. United States*, 458 F. Supp. 2d 424 (E.D. Mich. 2006), *aff'd*, 277 F. App'x 590 (6th Cir. 2008) (corporation could not claim "individual" status under § 6511(h)'s tolling provision when corporation's sole employee, officer, and shareholder alleged inability to file tax returns due to cancer diagnosis); *Brosi v. Comm'r*, 120 T.C. 5, 10, 2003 WL 118259 (2003) (for a taxpayer to qualify as financially disabled pursuant to § 6511(h), the physical or mental impairment must be that of the taxpayer, not of some third person); *Lawrence S. Deutsch, M.D. & Assocs. v. United States*, No. CV 16-5257, 2017 WL 1079996, at *2 (E.D. Pa. Mar. 21, 2017), *appeal dismissed sub nom. Lawrence S. Deutsch, M.D. & Assocs., P.C. v. USA*, No. 17-1720, 2017 WL 4863250 (3d Cir. Aug. 2, 2017) (because tolling under § 6511(h) only applies to an "individual" taxpayer, financial disability of sole member of professional corporation did not extend time for corporation to seek refund); *Pleconis v. I.R.S.*, No. CIV.A. 09-5970 SDWES, 2011 WL 3502057, at *7 (D.N.J. Aug. 10, 2011) (spouse who argued she did not file taxes, in part, because she was caring for her husband, could not claim financial disability because the physical or mental impairment has to be the taxpayer's, not a third person's); *see also* IRS Rev. Proc. 99-21, 1999-1 C.B. 960 (1999) ("Section 6511(h), as added by § 3202 of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, 112 Stat. 685 (July 22, 1998), suspends the statute of limitations period for filing a claim for credit or refund under § 6511(a) for any period of an *individual taxpayer's life* during which the taxpayer is unable to manage the taxpayer's financial affairs because of a medically determinable mental or physical impairment that can be expected to result in death, or has lasted (or can be expected to last) for a continuous period of not less than 12 months.") (emphasis added); *c.f.*, *In re Cook*, No. 14–20547, 2014 WL 5686272 (Bankr. S.D. Ga. Nov. 4, 2014) (decedent's estate not an "individual" as term used in 11 U.S.C. § 1301(a)).   In addition, bankruptcy law does not equate an estate with an individual.  *See, e.g., In re Cook*, No. 14-20547, 2014 WL 5686272, at *1 (Bankr. S.D. Ga. Nov. 4, 2014) ("A decedent estate is not an individual under the Bankruptcy Code."); *In re Estate of Patterson*, 64 B.R. 807, 808 (Bankr. W.D. Tex.1986) (estates are not "persons"); *In re Brown's Estate*, 16 B .R. 128, 128 (Bankr. D.D.C. 1981) (a probate estate is not an individual person within the meaning of the Bankruptcy Code); *but see In re Case*, 148 B.R. 901, 902 (Bankr. W.D. Mo. 1992) (decedent's estate is an individual because it is the extension of an individual natural person, the decedent).

Notably, *In re Case* equated an estate with the decedent, not the personal representative of the estate. This comports with § 6511(h), which allows an estate to invoke financial disability to excuse a late

Therefore, Carter may not invoke her financial disability to toll the time for the Estate's refund claim, and thus, § 6511(a) bars the Estate's refund claim because it was not timely filed administratively. Although the foregoing findings bar the court's exercise of jurisdiction over this matter, the prospect that § 6511(a) does not present a jurisdictional bar incites review of Carter's claim on the merits.[7]

---

refund claim when *the decedent* suffered from a financial disability, not the administrator of the estate. *See Estate of Rubinstein v. United States*, 96 Fed. Cl. 640, 642 (2011) (considering whether decedent's alleged financial disability tolled the time for estate to seek a refund); *Estate of Kirsch v. United States*, 265 F. Supp. 3d 315, 322 (W.D.N.Y. 2017) (same).

[7] Supreme Court jurisprudence no longer accords similar limitations periods jurisdictional status. In *United States v. Kwai Fun Wong*, 135 S. Ct. 1625 (2015), the Supreme Court held the limitations period for filing a Federal Tort Claims Act case is not jurisdictional. The Court determined "the Government must clear a high bar to establish that a statute of limitations is jurisdictional." *Id.* at 1632. "In recent years, [the Court has] repeatedly held that procedural rules, including time bars, cabin a court's power only if Congress has 'clearly state[d]' as much." *Id.* (citation omitted). "Time and again, [the Court has] described filing deadlines as 'quintessential claim-processing rules,' which 'seek to promote the orderly progress of litigation,' but do not deprive a court of authority to hear a case." *Id.* (citing *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)).

Therefore, to "ward off profligate use of the term 'jurisdiction,' [the Court has] adopted a 'readily administrable bright line' for determining whether to classify a statutory limitation as jurisdictional. . . . [Courts should] inquire whether Congress has 'clearly state[d]' that the rule is jurisdictional; absent such a clear statement, . . . 'courts should treat the restriction as nonjurisdictional in character.'" *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) (citations omitted). As a result, the Court has "repeatedly held that filing deadlines ordinarily are not jurisdictional . . . ." *Id.* at 154 (citations omitted).

Even more recently, the Supreme Court reconfirmed that a statute's limitations period primarily pertains to claim-processing, not subject matter jurisdiction. *See Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019) ("The Court has therefore stressed the distinction between jurisdictional prescriptions and nonjurisdictional claim-processing rules, which 'seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times.'" (quoting *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011))); *Nutraceutical Corp. v. Lambert*, 139 S. Ct. 710 (2019) (contrasting nonjurisdictional claim-processing rules subject to waiver by an opposing party with court procedural rules which clearly foreclose a flexible equitable tolling approach). "If a time prescription governing the transfer of adjudicatory authority from one Article III court to another appears in a statute, the limitation [will rank as] jurisdictional; otherwise, the time specification

# III. The Stock's Fair Market Value at the Time the Estate Filed Its Tax Return Governs

Even if the court determined § 6511(h) tolled the time for the Estate to file its

refund claim, the valuation of the Colonial stock establishes no entitlement to refund.

---

fits within the claim-processing category." *Hamer v. Neighborhood Hous. Servs. of Chicago*, 583 U.S. at __,138 S. Ct. 13, 20 (2017) (citation omitted).

Section 6511(a)'s filing deadlines appear to fall within the ambit of a claim-processing rule rather than a jurisdictional prerequisite. As similarly countenanced in *Kwai Fun Wong*, § 6511(a)'s "text speaks only to a claim's timeliness, not to a court's power." 135 S. Ct. at 1632; *see* § 6511 (describing the filing deadlines for administrative claims for tax credits and refunds). Section 6511 "'does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts.'" *Kwai Fun Wong*, 135 S. Ct. at 1633 (citations omitted). Furthermore, § 6511's limitations periods fall in a different section of the Internal Revenue Code from the jurisdiction granting provisions. *See* 28 U.S.C. § 1346(a)(1); 26 U.S.C. § 7422.

The court cognizes the Supreme Court referred to § 6511's time limits in jurisdictional terms in *United States v. Dalm*, 494 U.S. 596 (1990). In *Dalm*, the Court held the district court did not have jurisdiction over a suit seeking a refund of gift tax, interest, and penalties when the plaintiff did not file suit within the limitations period. *Id.* at 601. The Eleventh Circuit followed *Dalm*'s reasoning in dismissing a refund suit for lack of subject matter jurisdiction. *Wachovia Bank, N.A. v. United States*, 455 F.3d 1261, 1268-69 (11th Cir. 2006). However, the Supreme Court's recent jurisprudence portrays that courts "once used [the term "jurisdiction"] in a 'less than meticulous' manner." *Nutraceutical*, 139 S. Ct. at 714 n. 3 (citing *Hamer*, 583 U.S. at __, 138 S. Ct. at 21; *Kontrick v. Ryan*, 540 U.S. 443, 454 (2004)). "Those earlier statements did not necessarily signify that the rules at issue were formally 'jurisdictional' as [the Court uses] that term today." *Id.*

Nevertheless, the structural interpretation of § 6511(a) as a claims-processing rule may not overcome its prior construal as a jurisdictional provision. *See Fort Bend*, 139 S. Ct. at 1849 (The "Court has stated it would treat a requirement as 'jurisdictional' when 'a long line of Supreme Court decisions left undisturbed by Congress' attached a jurisdictional label to the prescription.") (citations & internal alterations omitted). Furthermore, notwithstanding the shadow cast on § 6511(a) as a jurisdictional provision, its limitations period applies to this action as it prescribes mandatory filing deadlines subject to a narrow tolling provision. *See Nutraceutical*, 139 S. Ct. at ("The mere fact that a time limit lacks jurisdictional force, however, does not render it malleable in every respect. Though subject to waiver and forfeiture, some claim-processing rules are "mandatory"—that is, they are "'unalterable'" if properly raised by an opposing party." (citing *Manrique v. United States*, 137 S. Ct. 1266, 1272 (2017); *see also Kontrick*, 540 U.S. at 456; *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam) (A claim-processing rule manifests as "mandatory" when a court must enforce the rule if a party "properly raise[s]" it.). Therefore, Defendant properly raised the limitations period prescribed by 26 U.S.C. § 6511(a), and it applies whether it is designated as a jurisdictional or claim processing rule.

A "taxable estate" consists of a "gross estate" reduced by deductions allowed by the Internal Revenue Code. *See* 26 U.S.C. §§ 2001, 2051. The "gross estate" comprises the fair market value of a decedent's property either on the date of death, or an "alternative valuation date," occurring six months from the decedent's death. 26 U.S.C. §§ 2031(a), 2032(a). In this case, the two possible valuation dates represent the date of Ms. Roper's death, September 21, 2007, or six months thereafter, March 21, 2008. Carter contends the Colonial stock was worthless at that time of its valuation due to fraud.

The fair market value of an asset constitutes the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 20.2031-1(b). For securities traded on the stock exchange, "the general rule is that the average exchange price quoted on the valuation date furnishes the most accurate, as well as the most readily ascertainable, measure of fair market value." *Amerada Hess Corp. v. Comm'r*, 517 F.2d 75, 83 (3rd Cir. 1975); *see also*, *United States v. Cartwright*, 411 U.S. 546, 551 (1973) ("[I]f the decedent had owned ordinary corporate stock listed on an exchange, its 'value' for estate tax purposes would be the price the estate could have obtained if it had sold the stock on the valuation date, that price being, under Treas. Reg. s 20.2031—2(b), the mean between the highest and lowest quoted selling prices on that day."); *Johnson v. Comm'r*, 74 T.C. 89, 93 (1980), *aff'd*, 673 F.2d 262

(9th Cir. 1982) ("[t]he obvious reason for using the exchange price as the fair market value of the stock is that such price is the best evidence of what a willing buyer will pay a willing seller for the stock").[8]

Unfortunately, the prevailing sentiment establishes that the fair market valuation method does not include an exception for fraudulent or criminal actions not known to the public, even if those actions lower or destroy the stock's value. This sentiment manifests initially in *Estate of Wright v Commissioner*, 43 B.T.A. 551 (1941). In *Wright*, the taxpayer contended a stock's exchange-traded price did not represent fair market value because the "prices were the result of misrepresentations and concealments of which purchasers and sellers on the Exchange were at that time unaware." *Id.* at 555. The Tax Court declined to disregard a "universally accepted market price, the result of numerous transactions in which the general public freely participated." *Id.* at 556. The fraudulent conduct alleged by the taxpayer, assuming it occurred "did not prove that the market did not exist or that the sales did not take place." *Id.*

Several other cases mirror *Wright*'s holding. *See Gourley v. United States*, No. 08–558 T, 2009 WL 2700206, at *5, 6 (Fed. Cl. Aug. 26, 2009) ("Even when the corporation engages in a 'deliberate, massive fraud' that conceals the true circumstances of the business, the price at which the stock could be bought and sold on a public exchange on

---

[8] *Johnson* identified exceptions to this rule, principally when "the stock was not sold on any exchange, or because the stock valued was part of a large block of stock, or because the stock price was artificially controlled by a syndicate." *Johnson v. Comm'r*, 74 T.C. 89, 96 (1980).

the valuation date remains the fair value of the stock…." The stockholders "possessed the same information that was available to the public when they bought this publicly traded stock and both they and the public knew what the stock sold for on that date. When a stock has a market value, that is generally the 'fair' valuation for tax assessment purposes."); *Polack v. Comm'r*, 366 F.3d 608, 612 (8th Cir. 2004) ("[i]nformation the hypothetical willing buyer could not have known is obviously irrelevant" to fair market value) (quoting *First Nat'l Bank of Kenosha v. United States*, 763 F.2d 891, 894 (7th Cir. 1985)); *Johnson*, 74 T.C. at 95–96 ("it is immaterial whether the officers did in fact misrepresent the earnings and profits of the corporation; in any event, the fair market value of the Mattel stock is to be based on prices for which such stock was sold on the NYSE."); *Gudmundsson v. United States*, 665 F. Supp. 2d 227, 238 (W.D.N.Y. 2009), *aff'd*, 634 F.3d 212 (2d Cir. 2011) (court rejected argument that valuation of stock should take into account fraud that caused stock's inflated price on relevant valuation date).

Carter argues the government cannot assume a different posture than its position during prosecution of the criminal fraud at issue. The government commenced its prosecution of the fraud in 2010. In its June 23, 2011, sentencing memorandum, the United States declared the fraud affected Colonial stocks' fair market value as of its disclosure to the public on August 3, 2009.[9] Of course, the flaw in the contention

---

[9] Specifically, the sentencing memorandum stated, "all individuals who held Colonial BancGroup common stock as of August 3, 2009 are victims because once the fraud was disclosed, the stockholders were unable to sell their stock for a price higher or equal to the price at which they purchased the

manifests upon initial review. The market for Colonial BancGroup did not collapse until more than one year after the Estate's valuation date. Until the fraud affected the exchange price, it exhibited no effect upon the stock's fair market value.

Carter also decries use of the average exchange price in these circumstances as "unfair, unequitable, and unjust," (Doc. 25 at 9), citing *Shackleford v. United States*, 262 F.3d 1028 (9th Cir. 2001). In *Shackleford*, the plaintiff estate argued use of annuity tables to determine the fair market value of future lottery payments yielded an inaccurate valuation. The court held the fair market valuation rule did not accurately reflect "economic reality" and sanctioned use of the "more realistic and reasonable valuation method" proposed by the estate. *Id.* at 1032.

The *Shackleford* decision rests upon distinguishable facts and regulations. In *Shackleford*, the IRS regulations required asset valuation pursuant to annuity tables for non-commercial annuities, such as future lottery payments, except when another regulatory provision applies. State law forbade the owner from assigning future payments, thereby reducing the actual value of the winnings. The court thus determined the asset's marketability was restricted and less valuable than an identical marketable asset. *Id.* at 1032. In such circumstances, the court approved a valuation method using a hypothetical buyer, seller, and market.

stock." (Doc. 1-4 at 21-22).

Rather than using annuity tables, as in *Shackleford*, the IRS utilizes the exchange rates set by the market for valuing stocks. The IRS determined, and courts agree, that this method of valuing stocks and securities sufficiently reflects the actual value of the stock. The Treasury regulations explicitly direct that "if there is a market for stocks or bonds, on a stock exchange, in an over-the-counter market, or otherwise, the mean between the highest and lowest quoted selling prices on the valuation date is the fair market value per share or bond." 26 C.F.R. § 20.2031-2(b). Had Plaintiff sold the stock upon the decedent's death or within six months thereafter, Plaintiff would have received the market rate for the stock as of that date, and that remains the appropriate valuation under IRS regulations. *See Johnson*, 673 F.2d at 265 (noting that the taxpayers in that case "were always free to sell their stock at the exchange price"). As the Tax Court stated in *Wright*,

> What petitioner's position would require us to hold, therefore, is that a universally accepted market price, the result of numerous transactions in which the general public freely participated, should be disregarded because more than two years later concealed facts were disclosed which, had they been known, might have created a different market from that which the facts show actually existed.

43 B.T.A. at 555; *accord Scher v. United States*, No. 1788-72, 1976 WL 1191, at *2 (D. N.J. Sept. 29, 1976) ("the requirement that the hypothetical willing but uncompelled buyer and seller used in the market value test have knowledge of relevant facts, does not

contemplate knowledge of insider information.   It encompasses only putative

knowledge of that data available in the marketplace.").[10]

Although the court is sympathetic to Carter's plight in these circumstances, it

cannot invoke its equitable powers to fashion relief against the ravages wreaked by the

criminal fraud.   *See United States v. Dalm*, 494 U.S. 596, 608 (1990) (A "party litigating a

tax claim in a timely proceeding may, in that proceeding, seek recoupment of a related,

and inconsistent, but now time-barred tax claim relating to the same transaction. . . .

To date, we have not allowed equitable recoupment to be the sole basis for

jurisdiction.").   In these circumstances, providing an equitable remedy would invade

upon the province of Congress.[11]

---

[10] Other examples exist where courts utilize an alternate valuation method.   *See Kuchman v. Comm'r*, 18 T.C. 154, 163 (1952) (petitioner held stock with contractual restrictions and could not find a buyer; thus, stock had no ascertainable fair market value and petitioner's acquisition of the stock did not justify charging petitioner with any income in the year of its receipt); *Frizzelle Farms, Inc. v. Comm'r*, 61 T.C. 737, 743 (1974), *aff'd per curiam*, 511 F.2d 1009 (4th Cir. 1975) (alternative valuation appropriate for unusual circumstances, such as valuation of a large block of stock or when stock is not freely transferable).   However, the circumstances differ from the case at bar, which involves stock publicly traded on the New York Stock Exchange and not otherwise non-transferable.

[11] Congress has intervened in the past to correct supposed injustices resulting from extreme fluctuations in market valuation.   Congress added the alternative valuation date provision after the stock market crash of 1929, in an apparent effort to provide relief for post-death decreases in the value of estate property.   *See* S. Rep. No. 1240, at 9 (1935); H.R. Rep. No. 74-1681, 74th Cong., 2d Sess. page 9 (1935); S. Rep. No. 74-1240, part 1, 74th Cong., 2d Sess. pages 9-10 (1935); S. Rep. No. 74-1240, part 2, 74th Cong., 2d Sess. pages 8-9 (1935); 79 Cong. Rec. 14632 (1935) (statement of Mr. Samuel B. Hill); *see also Maass v. Higgins*, 312 U.S. 443, 446 (1941) (purpose of predecessor to § 2032 was to "mitigate the hardship consequent upon shrinkage in the value of estates during the year following death"); Howard M. Zaritsky, *Re-Proposed Regulations on Value Changes During Alternate Valuation Period*, 39 Est. Plan. 44, 48, 2012 WL 1035953, at *1 (2012); Skye Christakos, *Has the IRS Gone Too Far with Its Alternate Valuation Date Proposed Regulations?*, 15 Lewis & Clark L. Rev. 491, 495–98 (2011).   Congress initially provided for an alternative valuation date one year after the decedent's death.   See H.R. Rep.

## CONCLUSION

Based on the foregoing analysis, the court will **GRANT** Defendant's Motion and

**DISMISS** this action **WITH PREJUDICE**.   The court will enter a separate order in

conformity with this Memorandum Opinion.

   **DONE** and **ORDERED** this 9th day of August, 2019.

_____

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

83-1337, 4116 (1954) ("Present law allows an estate to be valued at either the date of a decedent's death or 1 year thereafter.").   In 1970, Congress amended the alternative valuation date to six months after the decedent's death, in light of its change to the deadline for filing estate tax returns from 15 months to nine months.   Excise, Estate, and Gift Tax Adjustment Act of 1970, Pub. L. No. 91-614, §101(a)(1), 84 Stat. 1836, 1836 (1970).   Congress amended § 2032 again in 1984, adding subsection (c) to allow the election only if both the value of the gross estate and the estate tax were reduced.   *See* H.R. Rep. No. 98-432, at 1521 (1983) (stating that purpose of provision is to provide "relief for estate tax purposes where the value of the property decreased after death so that estate taxes are not inordinate.").   Most recently, H.R. 25, introduced in 2019, proposes repeal of the estate tax.   Based upon this legislative activity, the court should not use its equitable authority to address a matter clearly with Congress's purview and awareness.